Filed 5/20/25  P. v. Cook CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>TRISTAN COOK,<br><br>      Defendant and Appellant. | C100319<br><br>(Super. Ct. No. 20FE000410) |

A jury found defendant Tristan Cook guilty of manslaughter and attempted manslaughter.  It also found true two firearm enhancements.  The trial court sentenced defendant to 12 years four months in prison.  On appeal, defendant contends the trial court erred in refusing to dismiss one of his two firearm enhancements because the court failed to assess his future dangerousness if it dismissed the enhancement.  We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The information charged defendant with the murder of Nedra Vanhorn (murder victim) and the attempted murder of G.M.  (Pen. Code, §§ 187, subd. (a), 664/187,

1

subd. (a); further undesignated statutory references are to the Penal Code.) The information alleged firearm enhancements as to both crimes under section 12022.53, subdivisions (b), (c), and (d). Finally, the information alleged the special circumstance defendant committed the murder while he was engaged in the commission of a burglary. (§ 190.2, subd.(a)(17).)

On the night of January 5, 2020, officers responded to a call regarding a shooting on Crandall Avenue. When they arrived, they found G.M. in front of the house. G.M. told the responding officers his neighbor shot him. Officers found murder victim in a pool of blood inside the home. She had been hit by up to five bullets, one of which killed her. An officer arrested defendant walking away from the house. Defendant had $1,879 in cash on his person.

According to the trial testimony of G.M., he was a friend of murder victim. Murder victim lived with her boyfriend (murder victim's boyfriend). Murder victim's boyfriend was known to sell cocaine and keep a .45-caliber gun on the couch where he slept.

The night of the shooting, G.M. got off work about 11:00 p.m. G.M. was armed with a .40-caliber pistol when he went to murder victim's house. He knocked on the door and no one answered, but then the door opened as if by magic. G.M. saw murder victim sleeping on the couch but saw no sign of murder victim's boyfriend. Then, murder victim stood up and told G.M. the two of them were going to smoke marijuana together. Before they could start to smoke, murder victim went to the bathroom and G.M. heard her say, "what [are] you doing here?" Next, G.M. saw defendant standing in the bedroom and recognized him as the next door neighbor.

Defendant said something to G.M. and the two proceeded to race to get the pistol of murder victim's boyfriend that was on the couch. Defendant got to the gun first, and G.M. grabbed the barrel. Defendant fired the gun, shooting G.M. through the hand. While G.M. struggled to keep the barrel pointed away from him, defendant kept firing the

2

gun until it was empty. Bullets flew everywhere. Defendant shot G.M. in his hand, his shoulders, and abdomen.

After defendant emptied that gun, G.M. retrieved his own weapon. Defendant retreated into a room and closed the door. G.M. could hear defendant trying to reload his own weapon. G.M. racked his weapon to load a bullet in the chamber and waited for defendant to come out.

The next things G.M. heard were murder victim yell "no" and then a boom from the gun. G.M. saw murder victim fall backwards. G.M. fired two shots at defendant who jumped back. Defendant returned fire blindly towards G.M. from the room in which defendant was located. G.M. told defendant if he "want[ed] to get up out of here, you better do it now," and defendant jumped out of the window.

G.M. called the police from his cell phone. He hid his gun in a laundry room cabinet.

In the People's case-in-chief, defendant's cell phone showed 35 calls between defendant and murder victim's boyfriend between 9:53 p.m. and 10:28 p.m. the night of the shooting. There were a number of instant messages that suggested defendant was setting up a robbery around the time of the shooting, but nothing pointed to the house of murder victim's boyfriend and murder victim as the object of the robbery. The messages started on December 30, 2019, and the most recent one occurred at about 8:00 p.m. the night of the shooting, stating, "Is that lick still good." "Lick" is a common term for a robbery.

Officers found 17 .45-caliber shell casings and three .40-caliber shell casings in the house. Officers also found the gun used by defendant wedged in between the driver seat and the center console of a nearby car. Finally, they found the gun used by G.M. in the laundry room.

Defendant told the jury a different story. He moved into the neighborhood in July and met murder victim's boyfriend and murder victim shortly thereafter. Defendant

3

knew that murder victim's boyfriend was a drug dealer. Defendant visited murder victim and murder victim's boyfriend in their house. He would watch football at their home.

Defendant met G.M. though murder victim's boyfriend at murder victim's boyfriend's house. Defendant and G.M. were not friends, but they talked to one another. G.M. had a gun on his person every time defendant saw him. When G.M. came over, most of the time defendant would get up and leave, as he believed the other two men were conducting some type of business. Defendant testified, "I don't play with guns."

Defendant admitted he engaged in a text message conversation starting on December 30, 2019, where he discussed a "lick." Those messages related to stealing marijuana from someone in Modesto. He thought he and his accomplice could get a couple $1,000 each and that it would be easy. He texted his accomplice, "you're strapped?" meaning armed, "Just in case. Just in case."

The accomplice texted him back on January 4, 2020, asking, "Is that lick still good?" The accomplice said, "Call me back. We ready?" Despite a number of texts and follow-up phone calls, defendant testified this robbery never happened. Defendant also said he did not plan to burglarize his next door neighbor.

The day of the murder, defendant went over to murder victim's boyfriend's house to watch football and drink. Murder victim's boyfriend brought up the topic of women and having sex with them. Murder victim's boyfriend started showing defendant explicit photographs of women.

The two men left the house and went to the liquor store to get some beer. The men saw a couple of women walking by, and defendant asked murder victim's boyfriend if he was interested in them. When murder victim's boyfriend responded affirmatively, defendant got out of the car and started to talk with the women about having sex with murder victim's boyfriend for money. One of the women was agreeable and already knew murder victim's boyfriend's car and where he lived. The two men returned to the house anticipating the women's arrival.

4

While they were at home, murder victim's boyfriend pulled out some money and threw it on the table, indicating that was to pay the women. Defendant put the money in his pocket with the understanding he would use it to pay the women when they came over.

Defendant sat with murder victim's boyfriend for another hour and then said he was going to home. During that time, murder victim's boyfriend became angry with murder victim because she had left the gas on and murder victim's boyfriend was cussing and threatening to hit murder victim. Defendant wanted to leave.

Defendant went home. Murder victim's boyfriend called defendant while defendant was in the shower. Murder victim's boyfriend left a message, stating, "[C]all me back man. I'm trying to find out if she gonna come. And you tell her that I want to do it all."

Defendant listened to the message and went next door. Defendant knocked on the door, but murder victim's boyfriend did not answer. Defendant could see murder victim's boyfriend and murder victim asleep in the house, so he knocked on the door and called repeatedly but received no answer.

Eventually murder victim's boyfriend opened the door and let defendant in. Murder victim was asleep on the couch. The two men waited for the women to arrive. When the women did not show up, murder victim's boyfriend started to drink, get aggressive, and "talk[] crazy."

Murder victim's boyfriend said something that led defendant to believe murder victim's boyfriend was having sex with defendant's wife. Defendant said he was going to leave. When defendant got up, murder victim's boyfriend began to reach for his gun, so defendant grabbed him. While defendant held murder victim's boyfriend, the two men went back into the hallway and then fell into a room with defendant telling murder victim's boyfriend to calm down.

Defendant thought murder victim's boyfriend stopped breathing so he let murder victim's boyfriend go. Murder victim's boyfriend started to snore. Defendant did not know what to do so he decided to go home. When defendant came out into the living area, G.M. was there.

G.M. just looked at him. G.M. grabbed a bag, and defendant saw a gun next to murder victim's boyfriend's gun on the couch. As G.M. went toward the couch, defendant went for and grabbed murder victim's boyfriend's gun.

Defendant backed up with the gun and told G.M. he wanted to go home. G.M. responded by saying, "[Y]ou ain't going nowhere. Give me that gun."

Defendant testified G.M. rushed at him, grabbed his hand, and put his shoulder into defendant. The two fought, and the gun "start[ed] going off."

After the gun jammed, G.M. spun away. Defendant said I just want to go home. G.M. responded, "[N]ah, [motherfucker]. You're going to die today." Defendant retreated into the room, reloaded his gun, and defendant testified the two engaged in the gunfight G.M. described in his earlier testimony. The battle ended when defendant jumped out of the window.

Defendant got into his wife's car and disposed of the gun on the side of the seat. He got out of the car and was arrested by the police.

The jury found defendant not guilty of both first degree murder and second degree murder but guilty of voluntary manslaughter. It also found him not guilty of attempted murder of G.M. but guilty of attempted voluntary manslaughter. As to both counts, the jury found defendant personally used a firearm. (§ 12022.5, subd. (a).)

The probation report recommended defendant be sentenced to 12 years four months in prison, including four years for the first firearm enhancement and one third the midterm for the second.

Defendant filed a sentencing brief arguing the trial court should strike one of the firearm enhancements pursuant to section 1385, subdivision (c).

In addressing the trial court's discretion under section 1385, subdivision (c), the People argued the trial court should not strike the enhancements because dismissing the enhancement would reduce defendant's sentence "and likely result in serious danger to others because Defendant's lack of judgment and discretion shows his disregard for human life." The People sought a sentence of 23 years four months.

At sentencing, the trial court stated it had received and read the probation report, the People's sentencing brief, and the defense's sentencing memorandum. The court received letters from defendant's family and heard from witnesses and defendant. The trial court found: "The Court has considered the arguments on both sides, and I do feel a bit hamstrung by the law as it is today. There are mitigating factors that are true. [Defendant]'s record is very minimal. There is not a record of a propensity for violence for [defendant]. I tend to believe that he was planning some violent crimes. Hadn't committed them yet but was planning them. That's what the text messages show. [¶] Somewhere in [defendant]'s mind was some felony thinking, thinking that it was okay to lie to your wife about where you were that night, thinking it was okay, if [defendant]'s testimony is to be believed to be taking his neighbor's money to arrange for prostitutes that he knew for [murder victim]'s live-in boyfriend, thinking it was okay to strike [murder victim's boyfriend] unconscious to the point where [defendant], himself, thought he had seriously injured [murder victim's boyfriend] on that night, and none of that is the actual charges in this case. [¶] The jury did not find that [defendant] intentionally went over to commit an armed robbery. They did not find that he meant to kill [murder victim], but they did find that [defendant]'s actions amounted to voluntary manslaughter as to [murder victim] and attempted voluntary manslaughter as to [G.M.]. [¶] [Defendant] intentionally put a firearm in his hand and pulled the trigger 16 times. Now some of that might have been in a tussle. Some of those bullets might have gone off because of a fight for the firearm, but the evidence is clear with where the bullets fell that [defendant], with a firearm in his hand, pointed and shot, sometimes recklessly, but

7

definitely on purpose. [¶] And as supportive as [defendant]'s family is, there are consequences to that action of putting a firearm in your hand and pulling the trigger. Those are foreseeable consequences that someone might receive a bullet. [¶] In the Court's opinion, it is a big stretch of the law to get to upper term in this case, but it is even a farther stretch to do low term because the actions of [defendant] in aggravation do outweigh those in mitigation. [¶] The Court finds that probation's recommendation is the intent of the law in this case, and while it feels like not enough time given the loss to the family, given the dramatic changes to both [murder victim]'s family and [G.M.], the Court is adopting the recommendation set out in probation's report, and that is a selection of the midterm, as to Count 1, voluntary manslaughter, of six years with an additional midterm of four years relative to the 12022.5(a) for a principal term of ten years on Count 1. [¶] As to Count 2, the Court will sentence the defendant to one-third the midterm as well as the midterm on the enhancement of a 12022.5(a) for a total of two years and four months on Count 2 to be r[u]n consecutive. The defendant is to be committed to state prison for a term of 12 years and four months."

In concluding the hearing, the court further stated, "I want to make sure it is clear for the record that, in light of the facts of this case, the Court does believe that you are a danger to society for your rash reaction, your poor judgment on the day in question, and all the evidence including, yes, evidence of your own testimony. [¶] In the Court's assessment, your testimony about why you did certain things on that day and the body cam of how you were acting after this event showed that you were not being completely honest with the Court, with your wife, and those choices have consequences and make you a risk to public safety. That is why I'm selecting the midterm and not the low term. It is not enough on this record for the Court to select the upper term. Would have been a stretch. Probably could have been justified, but solidly this case is a midterm case with consecutive sentences and with the enhancements as to both. [¶] I have considered whether to strike the enhancement on the second count, but because of the seriousness of

8

your actions and the danger to public safety, I have declined to exercise my discretion to do that. I've considered everything including your childhood and your supportive family, and it is a loss for the victims here and for your family."

Defendant filed a timely notice of appeal.

DISCUSSION

Defendant argues the trial court erred when it failed to dismiss one of the two firearm enhancements because the trial court did not assess his future dangerousness if the trial court dismissed the enhancement. We disagree.

Section 1385, subdivision (c)(1) states, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so." Under section 1385, subdivision (c)(2), in exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.[1] Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. "Endanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others. Section 1385, subdivision (c)(2) "does not require the trial court to consider any particular factors in determining whether 'there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 299.)

---

[1] Our Supreme Court has clarified the "great weight" requirement. In *People v. Walker* (2024) 16 Cal.5th 1024, 1034, our Supreme Court held that "the plain language of section 1385, subdivision (c)(2) does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety." (*Walker*, at p. 1033.) Even if there are mitigating circumstances present, a trial court retains discretion to decide whether to dismiss an enhancement in the interests of justice under section 1385, subdivision (c)(2). (*Walker,* at p. 1036.)

We review a trial court's decision whether to strike or reduce an enhancement under section 1385 for abuse of discretion. (*People v. Mendoza*, *supra*, 88 Cal.App.5th at p. 298.) " ' "[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.) But " 'an abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard.' " (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.)

A finding defendant is presently a danger to society is not sufficient by and of itself to place great weight on the mitigating factors contained in section 1385, subdivision (c). Before it can decline to give great weight to those relevant mitigating circumstances, the trial court was required to examine whether the defendant would present a danger to society on the future date he might be released if the trial court struck enhancements from his sentence. (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at pp. 230-231.) A failure to do so is an abuse of discretion. (*Ibid.*)

In *Gonzalez*, the defendant was sentenced to 75 years to life for murder, which included an enhancement of 25 years to life in state prison for a firearm enhancement. (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at pp. 219-220.) The trial court declined to dismiss the enhancement finding that defendant was a present danger to society but without examining his dangerousness in the future when he might be ultimately released from prison. (*Id.* at p. 224.) The appellate court concluded the trial court abused its discretion because it merely examined whether the defendant was currently a danger to the public. The statute, however, required the trial court to consider the date on which the defendant could be released if the enhancement had been dismissed and the fact that

10

the release would be subject to a review by the Board of Parole Hearings and the Governor.  (*Id.* at pp. 230-231.)

As explained in *Gonzalez*, "Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence.  A currently dangerous defendant who will be released from prison within a short timeframe might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he is elderly." (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at p. 228.)

Here, the trial court did not limit itself to finding defendant was a current danger to society.  Rather, the court stated it considered everything submitted by the parties and concluded defendant was a danger to public safety.  Indeed, the court gave a list of some of the things it considered, including the defendant's supportive family, his childhood, the losses suffered by his victims and his family, but gave no indication this represented an exhaustive list or that it had failed to consider whether there was a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others in the future.  Indeed, one of the specific arguments it considered was the People's argument there was a likelihood the dismissal of the second enhancement and releasing defendant 16 months earlier would result in physical injury or serious danger to others.

The facts surrounding the crimes themselves also support the inference of future dangerousness.  Defendant had engaged in planning an armed robbery, if not of this home, then of a marijuana operation in Modesto.  And defendant still engaged in this shooting where he demonstrated reckless disregard for the safety of others and killed one person and wounded another.  Even taking defendant's testimony, the planned robbery is further evidence that he continues to be a danger to the community in the future.

11

From all of this, we conclude the trial court implicitly found that dismissing the second enhancement and releasing defendant 16 months earlier would endanger public safety. Notably, the court stated: "I have considered whether to strike the enhancement on the second count, but because of the seriousness of your actions and the danger to public safety, I have declined to exercise my discretion to do that. I've considered everything including your childhood and your supportive family, and it is a loss for the victims here and for your family." On this record that gives no indication otherwise, " 'a trial court is presumed to have been aware of and followed the applicable law.' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) We conclude the trial court did not abuse its discretion.[2]

## DISPOSITION

The judgment is affirmed.

/s/_____
Mesiwala, J.

We concur:

/s/_____
Hull, Acting P. J.

/s/_____
Feinberg, J.

_____

[2] Because we decide defendant's claim fails on the merits, we do not address defendant's forfeiture or ineffective assistance of counsel claim.